IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO
_____

MARY ANN O'NEAL, BEVERLY WILKINS,
and BEVERLY STEWART,

                    Plaintiffs,

v.                                                          Civ. No. 97-261 JP/DJS

DONNA SHALALA, SECRETARY OF THE
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

                    Defendant.


## MEMORANDUM OPINION AND ORDER

On April 10, 2000 Defendant filed a Motion to Dismiss for Lack of Jurisdiction and for

Partial Summary Judgment (Doc. No. 169) and a Motion for Partial Summary Judgment (Doc.

No. 167).  Defendant's Motion to Dismiss for Lack of Jurisdiction and for Partial Summary

Judgment will be granted in part and denied in part.  Defendant's Motion for Partial Summary

Judgment will be granted.

I.      **Defendant's Motion to Dismiss for Lack of Jurisdiction and for Partial Summary
        Judgment**

        A.      **Jurisdiction**

On February 27, 1997 Plaintiffs filed a Complaint alleging, in relevant part, that Defendant

discriminated against them because of their gender by creating a hostile work environment and

retaliated against them in violation of Title VII.  Following receipt of additional final agency

decisions, Plaintiffs on June 28, 1998 filed a Supplemental Complaint, adding additional factual

allegations to the existing causes of action.  In a January 19, 1999 Memorandum Opinion and

Order, I dismissed all of Plaintiffs Wilkins and Stewart's claims in the Complaint for failure to

exhaust administrative remedies.  (See Memo. Op. and Order, Jan. 19, 1999 at 5-7.)  In a January

11, 2000 Memorandum Opinion and Order, I dismissed a claim by all Plaintiffs, asserted in their

Supplemental Complaint, that a valid cause of action arose from Mr. Canizales' planned entry on

November 24, 1997 into Plaintiffs' workplace.  (See Memo. Op. and Order, Jan. 11, 2000 at 12.)

Thus, with respect to Plaintiffs Wilkins and Stewart, the only remaining claims were those arising

from Frank Canizales' entries on August 27, 1997 and October 2, 1997 into Plaintiffs' workplace,

as alleged in the Supplemental Complaint.  However, on January 20, 2000 Plaintiffs filed a

document in compliance with my Order of December 23, 1999 granting Defendant's motion for a

more definite statement.  Plaintiffs' January 20, 2000 "More Definite Statement" included

numerous allegations of retaliation, in addition to the two in the Supplemental Complaint that

were still vital.

Defendant moves to dismiss all allegations of retaliation in the Supplemental Complaint

and the More Definite Statement, with respect to Plaintiffs Wilkins and Stewart, on the ground

that these two Plaintiffs have failed to exhaust their administrative remedies.  Defendant maintains

that the only administrative charges Plaintiffs Wilkins and Stewart have properly before the court

are those alleging the creation of a hostile work environment when Mr. Canizales entered

Plaintiffs' place of work on August 27 and October 2, 1997.  Plaintiffs Wilkins and Stewart first

made those administrative charges on October 3 and 2, 1997, respectively.

Defendant acknowledges the rule repeated in Jones v. Runyon, 91 F.3d 1398, 1401-02

(10th Cir. 1996), cert. denied, 520 U.S. 1115 (1997), that an act "committed by an employer in

retaliation for the filing of an EEOC complaint" obviates the need for an additional EEOC

complaint.  Defendant's position is that Jones cannot assist Plaintiffs Wilkins and Stewart because

almost all of the acts which they claim as retaliatory preceded the filing of their administrative

charges.

### 1.        Single-filing rule

Plaintiffs Wilkins and Stewart respond that all of their claims, including those in the

Complaint, are timely under the single-filing rule.  Defendant claims the single-filing rule does not

apply.

The single-filing rule permits a plaintiff who has not filed an EEOC charge to "'piggyback'

on the timely filing of an EEOC charge by another plaintiff who faced similar discriminatory

treatment in the same time frame."  Gitlitz v. Compagnie Nationale Air-France, 129 F.3d 554, 557

(11th Cir. 1997).  Its purpose is to avoid requiring unnecessary administrative repetition of

identical or similar charges.  See Snell v. Suffolk County, 782 F.2d 1094, 1100 (2d Cir. 1986).

Courts applying the single-filing rule have noted that it is consistent with the Title VII policies of

notice to the employer and encouragement of conciliation.  See Lange v. Cigna Individual

Financial Svcs. Co., 759 F. Supp. 764, 767 (D. Kan. 1991).  The Tenth Circuit has applied the

single-filing rule, albeit not by name, in Mistretta v. Sandia Corp., 639 F.2d  588, 593-94 (10th

Cir. 1980).  Although not a Title VII case, the reasoning in Mistretta strongly indicates that the

Tenth Circuit would apply it in this case.[1]  Plaintiffs earlier asked me to apply the single-filing rule

---

[1] It is also worth noting that at least six other circuits have adopted the rule in the Title
VII context.  See Lange, 759 at 767 (citing cases).  So have other district courts in the Tenth
Circuit.  See, e.g., Rubidoux v. Johnston, 954 F. Supp. 1477, 1481 (D. Colo. 1997); Lange, 759
F. Supp. at 767.

in this case.  I declined to do so because, at that time, Plaintiff O'Neal's claims were not properly

before me.

But, now that Plaintiff O'Neal's claims in the Complaint have been reinstated, a closer

look at the single-filing rule is warranted.  Defendant argues that to invoke the single-filing rule,

the administrative complaint must contain "allegations of class-wide discrimination" under

Mistretta.  Thiessen v. GE Capital Corp., 996 F. Supp. 1071, 1076 (D. Kan. 1998).  In Thiessen,

that meant an administrative age discrimination charge that "[e]mployment decisions at GE

Capital for persons similarly situated . . . show a 'stark pattern' unexplainable on grounds other

than age" sufficed to allow class plaintiffs who did not first file administratively to join the class.

Id.

To the extent Defendant contends that the single-filing rule applies only to class action

cases, she is incorrect.  See, e.g., Mooney v. Aramco Svcs., Co., 54 F.3d 1207, 1223 (5th Cir.

1995).  Defendant is correct, however, that a plaintiff who actually files an administrative

complaint on her own behalf, but then fails to pursue it timely, should not later be permitted to

use the single-filing rule to excuse a lack of diligence.  See, e.g., Gitlitz, 129 F.3d at 557-58;

Mooney, 54 F.3d at 1223-24; Anderson v. Unisys Corp., 47 F.3d 302, 307, 308 (8th Cir.), cert.

denied, 576 U.S. 913 (1995).  But see Rubidoux, 954 F. Supp. at 1481.  Plaintiff Wilkins falls into

this category.  Plaintiff Wilkins on November 29, 1995 timely filed an administrative complaint.

On July 29, 1996 she received administrative notice that she had ninety days to file suit in federal

court.  Plaintiff Wilkins did not file her judicial complaint until almost seven months after

receiving her right-to-sue letter.  As the Fifth Circuit explained, "where the party wishing to

piggyback has filed his own EEOC charge, policy cuts the other way."  Mooney, 54 F.3d at 1223.

Once Plaintiff Wilkins filed her administrative complaint, Defendant was entitled to rely on it and the limitations period which accrued when she received her right to sue letter.  A plaintiff should not be allowed to put a defendant on notice, sleep on her rights, and then attempt to circumvent an explicit deadline by reviving a claim a defendant justifiably felt had expired.  Therefore Plaintiff Wilkins may not invoke the single-filing rule.[2]

Plaintiff Stewart may invoke the single-filing rule if she and Plaintiff O'Neal complain of "similar discriminatory treatment in the same time frame."  See Gitlitz, 129 F.3d at 557; Snell, 782 F.2d at 1101 (quoting Ezell v. Mobile Housing Board, 709 F.2d 1376, 1381 (11th Cir. 1983); Lange, 759 F. Supp. at 768.  In Snell, for example, the claims of non-filing black and Hispanic Title VII racial discrimination complainants, all arising in a three-year period at the same location, were sufficiently similar to those of the filing plaintiffs for single-filing purposes.  The claims of the filing plaintiffs put the employer on notice of discrimination "like or reasonably growing out of such allegations."  Snell, 782 F.2d at 1101 (quotation omitted).  An EEOC investigation would have revealed each of the district court plaintiffs' claims.  Id.

Plaintiff Stewart's complaints are similar and arose in the same time frame.   Therefore, she may invoke the single-filing rule.  Although Plaintiff O'Neal's June 20, 1994 administrative complaint upon which she based her judicial complaint mentions four specific instances of

---

[2] Plaintiff Stewart showed even less perseverance than Plaintiff Wilkins.  Plaintiff Stewart three times contacted the EEO and was three times notified of her right to file an administrative complaint, yet never did so.  However, Defendant does not argue that Plaintiff Stewart cannot now invoke the single filing rule (except to contend that her administrative allegations are not similar to Plaintiff O'Neal's.)  Apparently, those Courts of Appeals to consider the irony that a less-diligent plaintiff can benefit where a more-diligent plaintiff cannot, have, in spite of the apparent inconsistency, sanctioned this state of affairs.  See Gitlitz, 129 F.3d at 557-58 (citing cases from the Fifth and Eleventh Circuits).

discrimination, none of which explicitly include Plaintiff Stewart, Plaintiff Stewart's allegations appear to be quite similar to those made by Plaintiff O'Neal.  The document appended to the final agency decision of Defendant's EEO office, with respect to Plaintiff O'Neal, recognizes the allegation by Plaintiff Stewart and others that Mr. Canizales made offensive remarks about Plaintiff Stewart and others, upon which Ms. O'Neal based her June 20, 1994 administrative complaint.  (See Nov. 20, 1996 final agency decision attachment at 5, Compl. Ex. A.) Defendant's EEO office even denied Plaintiff O'Neal's administrative complaint on the ground that because Plaintiff Stewart and others attributed similar actions to Mr. Canizales, Plaintiff O'Neal was not or may not have been the target of harassing comments.  (See id. at 8.) Defendant was certainly aware, eventually, that Mr. Canizales' directed his allegedly unprofessional behavior at not only Plaintiff O'Neal, but also toward Plaintiff Stewart and others.

While Plaintiff Stewart provides no dates as to when she experienced the objectionable acts that give rise to her causes of action, she is at this point at something of a disadvantage for single-filing rule purposes.  As noted, to invoke the single-filing rule there is necessarily no administrative complaint to which reference can be made.  There also has not been, contrary to Snell for example, a jury trial upon which the court could assess Plaintiff Stewart's claims.  The reasonable inference from Plaintiff O'Neal's November 20, 1996 final agency decision is that the conduct upon which Plaintiff O'Neal bases her allegations is within the same time as that relating to Plaintiff Stewart.  Plaintiff Stewart alleges she and Plaintiff O'Neal were "constantly exposed to this offensive language and hostile behavior." (Compl. ¶ 60.)  The court will accept that allegation as true for the limited purpose of applying the single-filing rule to reinstate Plaintiff Stewart's claims with respect to the Complaint, except the claim dismissed by stipulation.

Accordingly, Plaintiff Stewart's claims in her Supplemental Complaint as explained in the More Definite Statement are also reinstated.  Defendant's objection, with respect to Plaintiff Stewart's supplemental retaliation claims, was that Plaintiff Stewart had no "main claim," <u>Jones</u>, 91 F.3d at 1402, upon which to append ancillary retaliation claims.  Now, there is a "main claim" of Plaintiff Stewart's properly before the court.  While the retaliatory acts Plaintiff Stewart alleges that Defendant took against her were not, and could not have been, in retaliation for filing her own EEOC charge, she may still maintain her retaliation claims for the same reason Plaintiff O'Neal can: because as retaliation claims they are reasonably related to Plaintiff O'Neal's EEOC complaints on which Plaintiff's district court complaints are based.  See <u>Ingels v. Thiokol Corp.</u>, 42 F.3d 616, 625 (10th Cir. 1994).  All of the retaliation allegations in the More Definite Statement relate in some fashion to Defendant's handling of Plaintiff O'Neal's initial allegations concerning Mr. Canizales.  As noted earlier, Defendant and the EEOC already had notice of Plaintiff O'Neal's and Plaintiff Stewart's allegations, for which additional EEOC filings would serve little purpose.

###    2.    Continuing violation doctrine and retaliation for engaging in protected conduct

Plaintiff Wilkins also responds that she has received a final agency decision which is still properly before the court.[3]  Plaintiff Wilkins identifies it only as "the other" final agency decision. Based on her letter to the court in response to the court's October 17, 2000 letter inquiry and Defendant's arguments in reply, it is reasonably apparent that the "other" final agency decision to

---

[3] Plaintiff Stewart makes the same arguments.  Because she has already been reinstated, with respect to all claims in the Complaint (except for a claim dismissed by stipulation) and those in the Supplemental Complaint (except for the allegation concerning events of November 24, 1997), her arguments here are moot.

which Plaintiff Wilkins refers must be that dated March 6, 1998 concerning Mr. Canizales' entries

into Plaintiffs' workplace on August 27 and October 2, 1997.  Plaintiff Wilkins claims this March

6, 1998 final agency decision, which concerns allegations first brought to the EEO's attention on

October 3, 1997, confers jurisdiction in this court over "previous hostile environment and

harassment and retaliation by virtue of the continuing violation theory."  (Pls' Resp. at 2.)

Plaintiff Wilkins further claims that the March 6, 1998 final agency decision is "nearly identical to

time and circumstances to their complaints."  (Id. at 3; see also letter to court from Pls' counsel

dated "April 13, 1999," at unnumbered page 4, in response to letter to counsel from court dated

October 17, 2000.)  Plaintiff Wilkins does not cite to any continuing violation theory case law or

any administrative charges or decisions.  Neither does she explain why some other doctrine might

enable her to circumvent administrative exhaustion requirements to put before the court

allegations that occurred before, but were not included in, her one EEOC charge which is still

vital.

To the extent Plaintiff Wilkins asserts that the continuing violation doctrine somehow

reinstates all of her previously dismissed claims, she is incorrect.  The doctrine applies to preserve,

in certain situations, conduct which would have been barred by a statute of limitations.  See

Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1311 (10th Cir. 1999) ("[A] continuing

violation claim will likely fail if the plaintiff knew, or through the exercise of reasonable diligence

would have known, she was being discriminated against at the time the earlier events occurred.")

The premise underlying the continuing violation doctrine--a plaintiff's lack of knowledge as to her

claims--is absent in this case.  This case also does not involve the egregious sort of harassment,

such as a rape, in which the Tenth Circuit has found a plaintiff's awareness did not defeat

application of the continuing violation doctrine.  See Martin v. Nannie and the Newborns, 3 F.3d 1410, 1415 n. 6 (10th Cir. 1993).

Plaintiff Wilkins may take a somewhat more colorable position to the extent she contends that all of her previously dismissed sex-based hostile work environment claims are properly before the court by virtue of the principle that "consideration of complaints not expressly included in an EEOC charge is appropriate where the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made."  See id. at 1416 n.7.  Yet it is far from clear that this is in fact her view.  Again, as with her continuing violation argument, Plaintiff Wilkins neither cites to cases nor provides a legal analysis.

In Martin, the plaintiff brought to the EEOC quid pro quo harassment charges as to one supervisor but not those relating to similar conduct by a second supervisor and a co-worker.  See id.  The Tenth Circuit nonetheless found that her complaints as to the second supervisor and the co-worker were reasonably related to those concerning the first supervisor.  Thus, complaints about all three men were properly before the court, since all the allegations would have come to light upon investigation.  See id.  In this case there is no question that EEOC would have known, and in fact did know, of Plaintiff Wilkins' allegations.  She herself brought administrative charges but then failed to pursue them timely in the district court.  Neither party offers any insight as to whether the principle stated in Martin footnote seven should apply in this situation.  Although I believe that it should not, for the same reason Plaintiff Wilkins cannot avail herself of the single-filing rule as discussed in section I.A.1. supra, it is a question that need not be further pursued.  As will be explained in section II infra, Plaintiffs O'Neal's and Stewart's sex-based hostile work environment claims in the Complaint and Supplemental Complaint, which are not materially

9

different from those of Plaintiff Wilkins, fail on their merits.

To the extent Plaintiff Wilkins argues that at least her retaliation claims are properly before the court, the inquiry is controlled by Jones.  The Tenth Circuit in Jones indicated that the "underlying claim" triggering the alleged retaliatory act must be properly before the court.  See Jones, 91 F.3d at 1402.  Although Plaintiff Wilkins filed administrative charges which may have caused some of the retaliatory acts described in the More Definite Statement, none of those administrative charges is properly before the court.  The only of Plaintiff Wilkins' administrative charges properly before the court post-dates all of the retaliatory acts, with the exception of what the parties have come to refer to as Plaintiff Wilkins' accretion of duties claim, set forth in the More Definite Statement.[4]  Because that instance of retaliation is imprecisely alleged to have occurred "on or about October 1, 1997" it may therefore have occurred after Plaintiff Wilkins' October 3, 1997 protected conduct.  Defendant concedes that if the protected conduct--making an October 3, 1997 administrative complaint--preceded the alleged retaliation, the retaliation would thus be reasonably related to the protected conduct under Jones.  Defendant has chosen to attack this claim on its merits, but has reserved the right to contest the timing of the claim, and

---

[4] Plaintiff Wilkins did have another administrative charge properly before the court, concerning Mr. Canizales' planned entry into Headquarters West on November 24, 1997.  That claim was dismissed on its merits in a Memorandum Opinion and Order filed January 11, 2000.  It may be possible that Plaintiffs could have nonetheless based a retaliation claim on that administrative charge.  See Sanchez v. Denver Pub. Schs., 164 F.3d 527, 533 (10th Cir. 1998) ("A meritorious retaliation claim will stand even if the underlying discrimination claim fails.") (citing Jeffries, 147 F.3d 1220, 1231 (10th Cir. 1998)).  Cf. Jones, 91 F.3d at 1402 (holding that a retaliation claim cannot attach to an underlying Title VII claim not administratively exhausted).  However, they cannot do so in this case with respect to any of the retaliation claims thus far asserted because the dismissed administrative charge, first made to the IHS EEO counselor on January 2, 1998, post-dates all of the alleged retaliation claims.

thus its jurisdiction, at trial.[5]  Therefore, this court presently has jurisdiction over Plaintiff Wilkins'
retaliation claims, as detailed in the More Definite Statement, concerning (1) the incidents of
August 27 and October 2, 1997 for which she has exhausted administrative remedies with an EEO
charge filed on October 3, 1997 and (2) Plaintiff Wilkins accretion of duties claim which accrued
on or about October 1, 1997.  There is no jurisdiction over all other of Plaintiff Wilkins'
retaliation claims.

     **B.**     **Partial Summary Judgment**

     Defendant moves for summary judgment as to each of Plaintiffs' retaliation claims.[6]
Properly before the court are Plaintiff Wilkins' claims concerning two of the twenty-two instances
of retaliation described in the More Definite Statement (Mr. Canizales' entries into her workplace
on August 27 and October 2, 1997) and all of Plaintiffs Stewart and O'Neal's claims, as indicated
in section I.A. supra.  Thus, what follows relates to Plaintiffs Stewart and O'Neal, except for the
allegations concerning the August 27 and October 2, 1997 events which will apply to all three
Plaintiffs.

---

     [5] It is axiomatic that a party cannot consent to subject matter jurisdiction.  See Insurance
Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982).  Because
subject matter jurisdiction over this claim is so unclear and because summary judgment will be
denied as to its merits, see section I.B.8 infra, I will expect the parties to address the jurisdictional
question in the first instance at trial.

     [6] The allegations in Plaintiffs' More Definite Statement are poorly delineated.  Similarly,
Defendant at times fails to explicitly identify, with a date or page or paragraph number for
example, the particular allegations in the More Definite Statement or Supplemental Complaint to
which its arguments are addressed.

### 1.   Mr. Canizales' entries into Plaintiffs' workplace

All told, Plaintiffs allege nine instances of retaliation when Mr. Canizales was allowed to enter their work site.[7]  The earliest entry occurred on March 7, 1994 and the latest on October 2, 1997.  Plaintiffs apparently requested leave or an alternate work site, which requests were denied, just prior to the March 7, 1994 entry.  With respect to the remaining eight times in which Mr. Canizales entered Plaintiffs' workplace, Plaintiffs claim simply that they were forced to take leave.  Defendant moves for summary judgment on the grounds that Mr. Canizales' entries into Plaintiffs' workplace does not amount to an adverse employment action, but that even if it did, Plaintiffs have not met their burden of presenting evidence that Defendant's legitimate business reason for Mr. Canizales' presence is pretextual.[8]

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  When applying this standard, the factual record and reasonable inferences therefrom are examined in the light most favorable to the party opposing summary judgment.  See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  The party moving for summary judgment bears the burden of "'showing'--that is, pointing out to the district court-- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U. S. 317, 325 (1986).  Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact.  See Bacchus Indus. Inc. v. Arvin

---

[7] Defendant purports to identify a tenth: an entry on August 23, 1997.  (See Def's Memo. at 2.)  However, Plaintiffs do not appear to allege an entry on that date.

[8] Defendant does not argue that Plaintiffs were not engaged in protected conduct prior to any of the alleged retaliatory acts.

Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The non-moving party has a "wide berth to

prove a factual controversy exists."  See Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir.

1998).  However, the non-moving party may not avoid summary judgment by resting upon the

mere allegations or denials of the pleadings.  See id.  In no event is the court to weigh evidence.

See Sealock v. Colorado, 218 F.3d 1205, 1210 n. 4 (10th Cir. 2000.)

> To establish a prima facie case of retaliation, a plaintiff must show: (1) protected
> opposition to discrimination; (2) adverse action by an employer contemporaneous with or
> subsequent to the employee's protected activity; and (3) a causal connection between such
> activity and the employer's action.  If a prima facie case is established, the burden of
> production shifts, and the Defendant must articulate a legitimate, nondiscriminatory reason
> for the adverse action.  Once the defendant has dispelled the inference of retaliation by
> establishing a legitimate reason, the plaintiff may still prevail if she demonstrates the
> articulated reason was a mere pretext for discrimination.

Purrginton v. University of Utah, 996 F.2d 1025, 1033 (10th Cir. 1993) (citations and quotations

omitted).

Adverse employment actions are those that work "a significant change in employment

status."  Sanchez, 164 F.3d at 531 (citation omitted).  They are not mere inconveniences.  See id.

The Tenth Circuit takes a "case by case" approach to whether an employment action is adverse,

but liberally defines an adverse action in recognition of the remedial nature of Title VII.  See

Jeffries v. Kansas, 147 F.3d 1220, 1232 (10th Cir. 1998).  In Jeffries, for example, threats from a

student's supervisor that he would no longer supervise her and would not renew her contract,

could, if supported by the facts, constitute an adverse action.  See id.  In Sauers v. Salt Lake

County, 1 F.3d 1122, 1128 (10th Cir. 1993), for another example, reassignment against the

employee's wishes was an adverse action.  I previously found that a plan, never effectuated, to

allow Mr. Canizales into Plaintiffs' workplace for a work-related purpose, with measures to keep

13

him from altering the conditions of Plaintiffs' employment, was not an adverse action.  Plaintiffs'

decisions to leave work did not change the result.  Now, the question is whether Mr. Canizales'

actual entries into Plaintiffs' workplace amount to adverse actions.

It may well be possible that an employer takes an adverse action against a plaintiff when

that employer permits the plaintiff's co-worker, with whom the plaintiff has an extremely tense

relationship, to enter the plaintiff's building.  But, to reach that conclusion in this case, without

further consideration, would be to ignore the facts.  First, Defendant presents the declaration of

Dr. Scott Bingham in which he states that Mr. Canizales did not enter Headquarters West on the

alleged dates until after Dr. Bingham first ascertained either: a) that Plaintiffs would not attend the

meeting Mr. Canizales might also attend, or b) whether the meeting was offered more than once,

in which case Plaintiffs could choose their preferred time and Mr. Canizales would attend at a

different time.  (See Declaration of Dr. Scott Bingham at ¶ 8, Def's Memo. Ex. 2.)  Moreover,

Dr. Bingham states that meetings at which Mr. Canizales might be present were on the first floor

and Plaintiffs' offices were on the third.  (See id.)  Still further, Dr. Bingham states that he

notified Plaintiffs in advance of the times Mr. Canizales would be in the Headquarters West

building and granted their requests to take administrative leave at those times.  (See id. ¶ 9.)

Plaintiffs object by arguing that Mr. Canizales was "frequently seen at the IPCC."  In

addition to Plaintiffs' failure to cite to any evidence which supports this statement, it is irrelevant.

All of the dates at issue post-dated Plaintiffs' move from the Indian Pueblo Cultural Center to

Headquarters West.  (See Declaration of Plaintiff O'Neal at ¶ 9, Pls' Resp. Ex. 2.)  Plaintiffs also

assert that Mr. Canizales was seen participating in a video conference.  Again, in addition to

Plaintiffs' failure to cite evidence in support, it is difficult to see how Mr. Canizales' video image,

14

seen at unknown times by unidentified people, chips away at the evidence of Defendant's measures to protect Plaintiffs from contact with Mr. Canizales.

The only evidence Plaintiffs offer which creates a material factual dispute is that which suggests Dr. Bingham's involvement in separating Mr. Canizales from Plaintiffs is overstated, but only with respect to the March 7, 1994 allegation.  Dr. Bingham only had the responsibility for such personnel matters beginning May 20, 1994, or perhaps later, when he became Acting Deputy Division Director.  See infra note 12.  At another time he testified that he did not become involved in this case until "after '95 . . . when they started to bring in Frank Canizales over to Headquarters West."  (Testimony of Dr. Bingham at 53, Pls' Resp., Ex. 5)  Further, Plaintiffs point to evidence that in March 1994 Mr. Canizales was observed on the same floor on which Plaintiffs worked.  Plaintiffs thus raise a material factual dispute as to whether the measures Defendant took to ensure an avoidance of contact between Plaintiffs and Mr. Canizales were in force in March 1994.  (See Declaration of Nelson at ¶ 6, Pls' Resp. Ex. 1.)  Without such measures in place on March 7, 1994, and given the uncontested allegation that their leave requests were denied, Plaintiffs may have been the victims of an adverse employment action on that date.

The next of the remaining eight dates on which Plaintiffs allege Defendant retaliated against them for allowing Mr. Canizales into Headquarters West, is October 19, 1995.  Plaintiffs offer no evidence to dispute that sufficient measures were taken by Defendant on these eight occasions to allay Plaintiffs' reasonable concerns, in balance with Defendant's competing duties to Mr. Canizales.  First, Donald Bruce's and Darrell Burn's affidavits cannot constitute contrary evidence, with respect to the eight relevant dates, because the affidavits were executed before those eight relevant dates.  Second, Marlene Echohawk's and Dr. Nelson's affidavit cannot

15

constitute contrary evidence because they only testify as to having seen Mr. Canizales once, on dates other than those at issue.  Third, Plaintiffs point to testimony by Dr. Bingham that, contrary to the initial practice, Mr. Canizales was not always under escort when in Headquarters West (although he was still required to log-in when entering.)  Even if that is so however, failing to keep Mr. Canizales under escort does not, in this case, in view of the other steps taken by management to prevent face-to-face contact, cause Mr. Canizales' presence to become a Title VII violation.  Fourth, Plaintiffs also point to their depositions in which they claim to have seen Mr. Canizales in their building unescorted at unspecified times.  Although their depositions do not support this statement, Plaintiff O'Neal does swear that she "had to worry constantly" about encountering Mr. Canizales at work and was forced to opt out of meetings at which they both would be in attendance.  (Declaration of Plaintiff O'Neal at ¶ 7, Pls' Resp. Ex. 2.)  Even if that is so, Plaintiffs still have not controverted the evidence showing that they were given the opportunity to take administrative leave when Mr. Canizales had to be in the building and that Mr. Canizales would only enter the building for a restricted purpose two floors below where Plaintiffs worked.  Indeed, that they in fact took leave is consistent with their claims on the eight dates at issue.  (See More Definite Statement at 9-10, 12-13, 15-17.)  In sum, the undisputed fact that Plaintiffs were allowed to take administrative leave after receiving advance notice that Mr. Canizales would be in the building on a different floor for a very limited purpose is alone a sufficient measure for IHS management to have taken.

Further, even if Mr. Canizales' entries into Headquarters West, with actions taken to assure that Plaintiffs would not encounter him, could be considered adverse actions within the meaning of Title VII, Defendant has offered evidence to indicate that Mr. Canizales was on the

premises for a legitimate, non-retaliatory reason.  (See, e.g., Declaration of Dr. Bingham at ¶¶ 7-8, Def's Memo. Ex. 2.)  In doing so, Defendant has dispelled an inference of retaliation which Plaintiffs have failed to counter, with respect to the eight later dates, by demonstrating that the articulated reason was a mere pretext for discrimination.

Plaintiffs make no explicit argument regarding pretext.[9]  A generous reading of Plaintiffs' response suggests that they offer the affidavits of Mssrs. Bruce and Burns as evidence of pretext. In his affidavit, Mr. Bruce describes overhearing Mr. Canizales on the third floor, presumably of Headquarters West "around March of 1994."  (Aff. of Mr. Bruce at 1, Pls' Resp. Ex. 5.)  Broadly construed, this allegation suffices to rebut Defendant's position that Mr. Canizales' entry into Headquarters West on March 7, 1994 was to attend a business meeting on the first floor.  It, and the remainder of the affidavit, does nothing to rebut Defendant's position with respect to the subsequent eight entries.  As stated earlier, the affidavits of Mssrs. Bruce and Burns pre-date the eight entries at issue.  They are thus insufficient to create the inference that Mr. Cainzales' entered Headquarters West, after the execution of the affidavits, for illegitimate non-business purposes. The same is true for the declaration of Dr. Nelson.  (See Declaration of Dr. Nelson, Pls' Resp. Ex. 1.)  Although that affidavit may contain allegations that Dr. Nelson suffered retaliation because of his role in Plaintiffs' EEO activities, it does not in any way indicate that Defendant permitted Mr. Canizales to enter the Headquarters West on the eight days at issue for retaliatory reasons.  Similarly, the e-mail message from "William C. Vanderwagon" contains no evidence of pretext.  (See Def's Memo. Ex. 2.)  Defendant suggests that Plaintiff O'Neal's testimony earlier in

---

[9] Plaintiffs' "ARGUMENT WITH LEGAL AUTHORITIES" in their response is a half-page that never uses the word "pretext" or even contains pretext-related arguments.  (It also cites no legal authority.)

this case that management decided to put Mr. Canizales "in our face" might be evidence of pretext.  (See id. Ex. 15.)  However, Plaintiffs do not adopt this position in response, and even if they did, a party's own "[c]onclusory statements are insufficient to defeat a motion for summary judgment."  See Martin, 3 F.3d at 1418 (citing cases).

In sum, the only retaliation allegation concerning Mr. Canizales' entries into Headquarters West for which summary judgment will not be granted is that stemming from Mr. Canizales' entry on March 7, 1994, and only with respect to Plaintiffs O'Neal and Stewart.  Before moving on, it is significant to note the position in which the Indian Health Service ("IHS") found itself with respect to Plaintiffs and Mr. Canizales.  As the Tenth Circuit has recognized, an employer's response to charges of harassment must be reasonable.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 676 (10th Cir. 1998).  While Plaintiffs may not like it, federal law confers certain rights on employees such as Mr. Canizales and corresponding duties on employers such as Defendant to temper its response to Plaintiffs grievances to fit the circumstances.[10]  An attempt to balance these competing rights and interests must not be mistaken for retaliation.  As the Sixth Circuit has commented in a similar case in which the plaintiff believed the law entitled it to harsh measures against an alleged harasser, "it would be unfair indeed to ignore the very practical dilemma which presented itself [to the employer]."  See Blankenship v. Parke Care Centers, Inc., 123 F.3d 868, 874 (6th Cir. 1997).  By taking reasonable measures to separate Plaintiffs from Mr. Canizales, such as granting Plaintiffs administrative leave when Mr. Canizales would be in the same building but on a different floor, Defendant walked the fine line required by federal law in such situations.

---

[10] Defendant claims that Mr. Canizales filed his own EEO charges, apparently stemming from Defendant's attempts to keep him separated from Plaintiffs and others.  Plaintiffs do not challenge this assertion.

18

### 2.      Cancellation of long-term training opportunity

Plaintiff O'Neal alleges in the More Definite Statement that Defendant retaliated against her opposition to alleged discrimination by canceling, on or about May 1, 1997, a training program to which Plaintiff O'Neal and five other people had applied.  It is an uncontested fact that if chosen, she would have been given the chance to pursue a doctorate for two years while still working for IHS.  (See Bulletin Amendment 1, Def's Memo. Ex. 12).  Plaintiff O'Neal's job did not require that she enter the program nor was entry into it some sort of perk that would have accrued to her by default.  (See id.)  She along with others who met the qualifications were merely entitled to apply for consideration.  (See id.)  There is no question that if Plaintiff O'Neal had been selected and if she had successfully earned an advanced degree, both she and IHS would have benefitted.  Plaintiff O'Neal presents evidence that she could reasonably have expected a full grade level promotion upon completion.  (See Declaration of Plaintiff O'Neal, Ex. 1 to Pl's Supp. Resp.)

I asked the parties to brief whether Plaintiff O'Neal has made out a prima facie retaliation claim.  Specifically, I instructed the parties to address whether the cancellation of the training opportunity amounted to an adverse employment action within the meaning of Title VII caselaw in the Tenth Circuit.  Although it presents a close question, I cannot find as a matter of law that the cancellation of the program is not an adverse employment action.  As noted earlier, the Tenth Circuit defines the concept liberally.  See Jeffries, 147 F.3d at 1232.  An adverse action can be one that has employment effects only in the future.  See Lee v. New Mexico State University Bd. of Regents, 102 F. Supp. 2d 1265, 1274-75 (D.N.M. 2000) (collecting cases).  It can include non-selection, see Trujillo v. New Mexico Dept. of Corrections, No. 98-2143, 1999 WL 194151,  **5

(April 8, 1999), and failure to promote, see Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  Therefore, there could also exist circumstances in which cancellation of a training program which would enhance a plaintiff's employment opportunities might constitute an adverse employment action.

Defendant argues that such circumstances are absent from this case.  Defendant cites to a series of decisions from the District of Kansas.  In those, the courts found that because other employees who had not engaged in protected conduct also suffered from the same employment action, the plaintiff could not have suffered a discriminatory adverse action in violation of Title VII.  See Adams v. Goodyear Tire and Rubber Co., No. 96-4228 SAC, 2000 WL 1310521 at *6 n.6 (D. Kan. Aug. 25, 2000.); Hertenstein v. Kimberly Home Health Care, Inc., 58 F. Supp. 2d 1250, 1259-60 (D. Kan. 1999).  Cf. Robinson v. Rhodes Furniture, Inc., 92 F. Supp. 2d 1162, 1169 (D. Kan. 2000).  Defendant then points out that IHS canceled the training opportunity with respect to all six applicants, not just Plaintiff O'Neal.  Therefore, Defendant reasons, the cancellation was not an adverse discriminatory action directed at Plaintiff O'Neal.

Defendant would have had to be especially vindictive to deprive other applicants who had not engaged in protected conduct of an opportunity which would enrich Defendant as well as the applicants in order to strike back against Plaintiff O'Neal.  Although such a scenario is unlikely, I cannot conclude that it is legally impossible.  Moreover, at least one of the other five applicants, Maria Stetter, also had engaged in prior opposition to discrimination, making it somewhat more possible that Defendant decided to cancel the program to retaliate against Plaintiff O'Neal in violation of Title VII.  The more appropriate framework in which to assess the fact that other "innocent" individuals also suffered from the program's cancellation is not in the context of a

plaintiff's prima facie case, but later, in assessing the employer's motive.  See Berry v. General

Motors Co., 838 F. Supp. 1479, 1498 (D. Kan. 1993) (finding after bench trial that plaintiff who

was transferred and not given vacation at requested time stated prima facie case but had not

proven her claim since other employees were treated similarly to plaintiff); see also Cone v.

Longmont United Hosp. Ass'n, 14 F.3d 526, 530 (10th Cir. 1996) (commenting that "summary

judgment is not ordinarily appropriate for settling issues of intent or motivation").

Defendant also maintains that Plaintiff O'Neal has not established a causal connection

between the protected conduct and the adverse action.  Defendant contends that Dr. Harry, the

individual who in 1997 canceled the training program did not know "the identity of any of the

applicants."  (See Declaration of Dr. Harry at ¶ 1, Def's Memo. Ex. 5.)  Based on Dr. Harry's

statement, Defendant reasons that Plaintiff O'Neal's protected conduct could not have been a

factor in his decision to cancel the program.

Plaintiff O'Neal points to a letter notifying her that the program was canceled, personally

addressed to her and signed by Dr. Harry.  (See Pl's Resp. Ex. 7.)  Plaintiff O'Neal contends that

Dr. Harry's letter establishes that he did in fact know her identity.  Plaintiff O'Neal also

establishes that Ron Freeman, an employee on Dr. Harry's staff, knew that Plaintiff O'Neal had

applied for the training opportunity.  Plaintiff O'Neal claims that because Mr. Freeman knew

Plaintiff O'Neal had applied and because Mr. Freeman worked with Dr. Harry, a fact-finder might

conclude that Dr. Harry also knew that Plaintiff O'Neal had applied.  Finally, Plaintiff O'Neal

cites to Dr. Harry's deposition, in which he states that he was aware in 1996 that Plaintiff O'Neal

had filed EEO complaints.  (See Reply to Def's Resp. to Pls' Mot. Requesting Permission to File

Supp. Resp. Ex. 4 at 30.)  Defendant in reply contends that Dr. Harry's letter to Plaintiff does not

refute Defendant's position that Dr. Harry did not know Plaintiff O'Neal's identity "beforehand."
(Def's Reply at 8.)  Defendant does not address Mr. Freeman's role or knowledge, or Dr. Harry's
deposition.

While it may be that Dr. Harry did not know Plaintiff O'Neal was one of the applicants
before or at the time he decided to cancel the long-term training opportunity, that is not what he
claims in his declaration.  He says simply that he did not know of any applicants' identities.  He
implies, therefore, that he <u>never</u> knew them.  Plaintiff O'Neal has presented evidence, with Dr.
Harry's letter to her, that he did know she had applied for the program when he advised her that
he canceled the program.  While it may be that the salutation to Plaintiff O'Neal in Dr. Harry's
letter can be reconciled with Dr. Harry's claim that he did not know Plaintiff O'Neal's identity as
a program applicant or did not know of it at sometime when he decided to cancel the program
before he sent the letter, I find that Plaintiff O'Neal presents an issue of material fact with respect
to Dr. Harry's knowledge.  As it is an apparently uncontested fact that Dr. Harry knew in 1996
that Plaintiff O'Neal had engaged in protected conduct, Plaintiff O'Neal sufficiently presents an
issue of material fact with respect to causation.  I therefore do not reach the question of actual or
perhaps constructive knowledge posed by Mr. Freeman's involvement.

Next, Defendant offers a non-discriminatory reason for the cancellation: budget
constraints.  Defendant points to Dr. Harry's declaration in which he states that sometime after
March 1997 when he assumed the position of Acting Director, Office of Public Health, IHS, he
surmised that his office could no longer support the training program.  Plaintiff O'Neal presents a
document from the same office titled "IHS Headquarters Training Opportunity Bulletin
Amendment 1."  (<u>See</u> Reply to Def's Resp. to Pls' Mot. Req. Permission to File Supp. Resp.,  Ex.

22

5 at 4) (same as Def's Ex. 12).  The Bulletin Amendment notes at the top, "Opens: August 1,

1996" and "Closes: August 30, 1996" but is otherwise undated.  In it, under the heading "Funding

Requirements," it states that the Office of Health Programs will provide and make available funds

to cover "staff, tuition, fees and books" for the training period beginning August 1997 to August

1999, with an option to extend for an additional year.  (Id. at 5).  Plaintiff O'Neal also presents an

undated document titled "Long Term Training Justification" from the Office of Health Program.

(See id. at 1.)  That document urges continuation of the long-term training program and cautions

readers not to allow "competing fiscal priorities" to delay the program.  (Id.)  Plaintiff O'Neal

claims the Bulletin Amendment and the Long Term Training Justification call into question

Defendant's stated budgetary reason for canceling the program.  Plaintiff O'Neal also seems to

imply that Dr. Harry's previously noted positions concerning his knowledge of Plaintiff O'Neal's

identity as a program applicant cast doubt on his credibility as to the legitimacy of Defendant's

business reason which rests only on Dr. Harry's declaration.  Defendant does not respond to these

arguments.

   While the Bulletin Amendment and the Long Term Training Justification, on the one hand,

and Dr. Harry's claim concerning budgetary problems, on the other hand, may be reconcilable, I

find that Plaintiff O'Neal has shown the existence of a material factual dispute as to whether

Defendant's legitimate business reason is pretextual, i.e., unworthy of belief.  Defendant's motion

for summary judgment with respect to Plaintiff O'Neal's retaliation claim stemming from the

cancellation of the long-term training opportunity will therefore be denied.

### 3.  Appointment of Dr. Bingham

   Plaintiff O'Neal alleges in her Supplemental Complaint and More Definite Statement that

Defendant retaliated against her on or about November 5, 1997 when Dr. Bingham replaced her

as Acting Chief of the Mental Health/Social Services Program.  (See Supp. Compl. ¶¶ 8-9; More

Definite Statement at 19-19.)[11]  Defendant's position, supported by Dr. Bingham's affidavit, is

that Dr. Bingham was at all relevant times the Acting Deputy Division Director of the Division of

Clinical and Preventive Services (of which apparently the Mental Health/Social Services Program

is a part) and that Dr. Bingham was never the Chief of any Branch with the Division.  The

evidence conflicts as to what Plaintiff O'Neal's and Dr. Bingham's jobs or job titles were.[12]  Thus,

a material factual dispute exists as to whether Dr. Bingham replaced her as Acting Chief of

_____

[11] She also alleges retaliation through the loss of her "status and authority" as the Deputy
Chief of the Mental Health/Social Services Program.  (See, e.g., Supp. Compl. ¶ 10.)  Defendant
presents evidence that the Division of Clinical and Preventive Services, the Division in which
Plaintiff O'Neal apparently worked, was restructured beginning March 1997 so that it was no
longer comprised of Chiefs and Deputy Chiefs.  However, the gravamen of her allegation
concerning the loss of her status and authority concerns the appointment of Dr. Bingham, as she
explains in her More Definite Statement.  (See More Definite Statement at 19.)  Thus,
Defendant's evidence concerning reorganization misses the mark.  And even if it did not, Plaintiff
has pointed to evidence disputing that such a reorganization took place at the stated times.  (See,
e.g., Travel Order, Pls' Resp. Ex. 9 (listing Plaintiff O'Neal as "Chief, Social Services," dated
Feb. 10, 1999); Summary Rating, Pls' Resp. Ex. 13 (listing Dr. Bingham as "Actg Chief," dated
Jan. 5, 1998)).

[12] Plaintiff O'Neal claims, through the declaration of Dr. Nelson, that her "officially
approved title" was Social Work Consultant at all relevant times but that her "program
(functional) title" was Chief of Social Services from her initial hire "and then expanded" to
Deputy Chief of Mental Health/Social Services when the two programs were combined.
(Declaration of Dr. Nelson at ¶ 12, Pls' Resp. Ex. 1.)  Reading the facts in Dr. Nelson's and
Plaintiff O'Neal's declarations in a light most favorable to Plaintiff O'Neal suggests that Plaintiff's
title prior to Dr. Nelson's departure was Deputy Chief, but that she had filled the role of Chief in
an interim or "acting" capacity until Dr. Bingham's placement as "Acting Chief."
      Dr. Bingham swears that his title from May 20, 1994 to September 1, 1999 was Acting
Deputy Director, Division of Clinical and Preventive Services.  (See Declaration of Dr. Bingham
at ¶ 3, Def's Memo. Ex. 2.)  But, a memo from Dr. Harry to Dr. Bingham dated November 27,
1997 indicates that Dr. Bingham was to assume the position of Acting Deputy Director, Division
of Clinical and Preventive Services, "[e]ffective immediately."  (Def's Memo. Ex. 10.)

Mental Health/Social Services because of prior protected conduct.  (See Summary Rating, Pls'
Resp. Ex. 13 (listing Dr. Bingham as "Actg Chief," dated Jan. 5, 1998).)  More importantly,
specific job titles aside, Plaintiff O'Neal's complaint is in essence that because of Plaintiff
O'Neal's prior complaints of discrimination, Defendant gave to Dr. Bingham a supervisory job
that should have gone to her when Dr. Nelson left.  She has presented evidence that Defendant
did just that.  (See Declaration of Dr. Nelson ¶ 13, Pls' Resp. Ex. 1 (stating that Dr. Bingham will
be "interim supervisor" over the "MH/SS" program); e-mail to Plaintiff O'Neal from Dr. Nelson
dated October 21, 1997, Pls' Resp. Ex. 12 (same).)  Defendant's motion for summary judgment
with respect to Plaintiff O'Neal's retaliation claims stemming from the hiring of Dr. Bingham
therefore will be denied.

### 4.    Restructuring of Mental Health Chief position

Plaintiff O'Neal alleges in her More Definite Statement that Defendant retaliated against
her on or about February 1, 1999 by restructuring "the vacant MH chief position" to exclude
social workers, like herself.  (More Definite Statement at 20.)  Defendant argues that the Mental
Health Chief position ceased to exist in March 1997 due to reorganization.  Defendant claims that
IHS instead developed a position called Principal Consultant which, as of the last job posting on
September 8, 1999, was open to social workers.  Defendant attaches in support Vacancy
Announcement No. IHS-99-58(R2)(A) for an unnamed "Interdisciplinary Position."  (See Def's
Memo. Ex. 4.)  The Announcement indicates that Supervisory Social Workers qualify to apply.
Plaintiff responds that the Announcement which Defendant attaches is actually a second

announcement which was amended to include social workers after the first posting.[13]  Defendant

replies by attaching what it describes as the first Vacancy Announcement, affixed to the affidavit

of Sara J. Matte, the IHS Director of Human Resources.  In her affidavit, Ms. Matte testifies that

social workers were eligible for the position at issue from the first posting.

The Vacancy Announcement which Defendant attaches in reply bears out Defendant's

position.  Although Plaintiff O'Neal argues that the first Announcement for Principal Mental

Health Consultant, in March 1999, excluded her profession, she cites only to her own affidavit in

support.  Plaintiff O'Neal's own personal belief is insufficient to create a triable issue of fact,

especially where her belief is inconsistent with that of the IHS Director of Human Resources.  See

Cisneros v. Wilson, 226 F.3d 1113, 1130-31 (10th Cir. 2000).  Summary judgment will therefore

be granted with respect to Plaintiff O'Neal's claim that IHS retaliatorily restructured a vacant

"MH chief position."

### 5.        Proposed and preliminary personnel actions

Plaintiffs O'Neal and Stewart allege in their More Definite Statement that Defendant

retaliated against them on March 9, 1994 when IHS managers ordered that they and Dr. Nelson

be reassigned and on April 28, 1994 when Dr. Phil Smith told Dr. Nelson that Dr. Nelson would

be reassigned to the Aberdeen office.  They also claim retaliation on or about April 18, 1995 when

their positions were targeted for elimination.  There is no allegation or argument that Dr. Nelson

was ever reassigned against his wishes or that Plaintiffs' positions were eliminated. Plaintiff

O'Neal further claims a retaliatory act occurred on the same day when her position was not

---

[13] The clear implication in Plaintiff O'Neal's response is that Announcement No. IHS-99-58(R2)(A) concerns the same "vacant MH chief position" from which she claims exclusion.

identified as "residual."  (More Definite Statement at 8.)  Defendant apparently does not dispute

the truth of these allegations.[14]  Instead, Defendant appears to claim entitlement to summary

judgment as to these assertions because proposals to take personnel actions, as well as preliminary

steps to personnel actions, are not actionable.

Summary judgment will be granted as to the allegation concerning Dr. Nelson's

reassignment and the allegations concerning Plaintiffs O'Neal's and Stewart's positions on April

18, 1995 for at least two reasons.  First, Plaintiffs failed to respond to Defendant's legal argument

concerning these claims and thus they are deemed to have consented to it.  See D.N.M. LR-Civ

7.5(b).  Second, Defendant accurately states the law.  Proposals to take a personnel action or

other preliminary step to taking a personnel action do not give rise to Title VII claims.  See 29

C.F.R. § 1614.107(a)(5); Ritter v. Dalton, No. Civ. A 96-2036, 1997 WL 697181 at *2 (4th Cir.

Nov. 7, 1997); Colantuoni v. Macomber, 807 F. Supp. 835, 838-39 (D.D.C. 1992).  Additionally,

a change in the identity of Plaintiffs' supervisor is not an adverse employment action.  See

Johnson v. Junction City Foundry, Inc., No. Civ. A. 98-4077, 2000 WL 245810 at *2 (D. Kan.

Feb. 29, 2000).  Still further, to the extent Plaintiffs claim injury from injury accruing to Dr.

Nelson, they fail to explain why they would have standing to make such a claim.

Plaintiffs O'Neal's and Stewart's allegation that on March 9, 1994 Defendant retaliated

against them when IHS mangers ordered them reassigned out of state against their wishes is

_____

[14] While it appears that Defendant addresses its argument in section II.C. of its
memorandum at the factual claims described above, Defendant is not explicit.  Defendant does not
identify the target of section II.C. with reference to the Complaint, Supplemental Complaint,
More Definite Statement, or any facts of any allegations.  Instead, she argues why "three
[proposed] retaliatory" actions directed at Plaintiff O'Neal, "two against her supervisor," and one
preliminary step to a proposed action cannot legally state a claim.  (Def's Memo. at 19.)

different.  Again, Defendant's only defense is that this was a mere proposal upon which IHS never

acted.  Here, however, Plaintiffs present evidence that this was more than just an abandoned

proposal.  On June 16, 1999 Plaintiff O'Neal was reassigned to Rockville, Maryland.  (See letter

to Plaintiff O'Neal from Gary Hartz, dated June 16, 1999, Pls' Resp. Ex. 18.)  Sometime before

December 9, 1999 Plaintiff Stewart was also reassigned to Rockville.  (See letter from Plaintiff

Stewart to Mary Lou Stanton, dated December 9, 1999, Pls' Resp. Ex. 19.)  Legitimate non-

discriminatory reasons for at least Plaintiff O'Neal's reassignment might be found in the record

(but so could evidence of pretext.)  However, Defendant neither points the court to such reasons

nor articulates any argument relating to Plaintiffs' reassignments.  With respect to Plaintiffs

O'Neal's and Stewart's claims that they were retaliatorily reassigned, summary judgment will

therefore be denied.

### 6.        Correspondence to Dr. Nelson from Dr. Vanderwagen and Dr. Smith

Plaintiffs O'Neal and Stewart claim to have suffered retaliation when on July 29, 1993 Dr.

Vanderwagen allegedly sent an e-mail message to Dr. Nelson in which he called Plaintiffs'

allegations of harassment petty and unprofessional.  They also claim retaliation when Dr. Phil

Smith on June 3, 1994 sent a memo to Dr. Nelson disparaging Plaintiffs O'Neal and Stewart.

Dr. Vanderwagen's July 29, 1993 e-mail message indicates that leaking "inside info"

concerning Mr. Canizales, to "everyone in the world" gave him concern that "we appear petty and

unprofessional."  (Def's Memo. Ex. 3.)  Clearly Dr. Vanderwagen did not agree at that time with

Plaintiffs' strongly held view that their course--moving Mr. Canizales out of Albuquerque--was

the only acceptable choice.  As he stated, Dr. Vanderwagen had valid reasons for not choosing

Plaintiffs' route, such as continuing one of IHS mission's of assimilating American Indian males

while repairing damage done to the program.  Plaintiffs have done nothing to show that Dr.

Vanderwagen's reasons for not moving Mr. Canizales were pretextual.  Indeed, the sum total of

Plaintiffs' response to Defendant's argument is to simply describe Dr. Vanderwagen's e-mail as

containing "retaliatory statements exhibiting retaliatory intent."  (Pls' Resp. at 12.)  This assertion

is not evidence or even good argument.  Summary judgment will therefore be granted as to this

claim concerning Dr. Vanderwagen's July 29, 1993 e-mail.

Plaintiffs O'Neal and Stewart do not respond to Defendant's argument concerning Dr.

Smith's June 3, 1994 memo to Dr. Nelson.  They will therefore be deemed to have consented to

it.  See D.N.M. LR-Civ 7.5(b).  Even if Plaintiffs had responded, they could not have done so

persuasively.  For instance, the message in question concerns Dr. Nelson and, again, Plaintiffs do

not have standing to assert his claims.  And even if Dr. Smith's criticisms could be taken as

directed at Plaintiffs, mere criticism and counseling, for non-discriminatory reasons, do not

constitute an adverse action.  See Jeffries v. State of Kansas, 946 F. Supp. 1556, 1566 (D. Kan

1996) (citing Simmerman v. Hardee's Food Systems, Inc., No. 94-6906, 1996 WL 131948, at *14

(E.D.Pa. Mar. 22, 1996)), aff'd in part and rev'd in part, 147 F.3d 1220 (10th Cir. 1998).

### 7.    Plaintiff O'Neal's participation in the Eldercare Focus Group

Plaintiff O'Neal in her More Definite Statement alleges that she suffered retaliation on or

about February 13, 1996 when she was excluded from participation in the Eldercare Focus

Group.  She claims she had participated in this activity before and "as Chief of Social Services,

represented a primary health service to elders."  (More Definite Statement at 10.)  Defendant

describes the Eldercare Focus Group as a program not for Plaintiff O'Neal's benefit but to benefit

others.  Defendant also points out that, by Plaintiff O'Neal's own admission, Plaintiff O'Neal had

participated before.  For these reasons, Defendant argues, her exclusion is not an adverse action.

Plaintiff O'Neal fails to respond and thus will be deemed to have consented to this argument.  <u>See</u>

D.N.M. LR-Civ. 7.5(b).

### 8.    Plaintiff Wilkins' accretion of duties claim

Plaintiff Wilkins in the More Definite Statement contends that Defendant retaliated against

her by refusing to recognize and compensate her for increased responsibilities that fell to her when

the duties of her previous supervisor were assigned to her.  (<u>See</u> More Definite Statement at 16.)

She claims Dr. Vanderwagen took this retaliatory act on or about October 1, 1997.  On October

3, 1997, she filed the only of the administrative charges still before the court to which she is a

party.  That administrative charge did not include an allegation concerning the accretion of duties

to her.  Defendant now moves for summary judgment as to the merits of this accretion of duties

retaliation claim.  Defendant also reserves the right to contest jurisdiction at trial if the refusal to

compensate actually occurred before October 3, 1997 and thus cannot be reasonably related to or

caused by her one vital EEOC charge.

Defendant briefed the motion for summary judgment based on the date alleged in the

More Definite Statement.  Defendant relied solely on the declaration of Darrell Caldwell, IHS

Operating Personnel Officer at Headquarters West.  In it, Mr. Caldwell claimed that an employee

can receive an accretion of duties promotion only following an employee- or supervisor-requested

"desk audit," or after an agency's sua sponte review.  (<u>See</u> Def's Memo. Ex. 5 ¶ 2.)  He then

stated that in 1997 neither Plaintiff Wilkins nor her supervisor requested a desk audit, nor did the

agency in 1997 conduct its own review.  (<u>See id.</u> ¶ 3.)  Mr. Caldwell claimed that he would have

been the individual who would have to approve a promotion for Plaintiff Wilkins. (<u>See id.</u> ¶ 4.)

He also alleged that he did not learn of Plaintiff Wilkins' protected activity until March 2000. (See id. ¶ 5.)

Plaintiff then responded with extensive evidence contradicting Mr. Caldwell's clear implication that no desk review or audit took place.[15]  According to several sources, at least one desk review or audit took place during September 1998.  (See Notification of Personnel Action signed by Darrell J. Caldwell, Pls. Resp. Ex. 15; Memo from Mary Lou Stanton to Plaintiff O'Neal and Special Act Award, Pls' Resp. Ex. 17).  By Plaintiff Wilkins' own admission, in August 1999 she received a promotion and/or raise.  (See Declaration of Plaintiff Wilkins, Pls' Resp. Ex. 3 ¶ 10; see also Pls' Resp. Ex. 15.)  At about the same time, IHS also recognized Plaintiff Wilkins with a financial award to compensate her for increased duties during the period from March 14, 1999 until the effective date of her raise and promotion.  (See Pls' Resp. Ex. 17.)

Defendant replied by contending that Plaintiff has not shown any evidence that on or about October 1, 1997 IHS refused to recognize and compensate Plaintiff for increased duties. Defendant reached this conclusion because of the allegedly uncontroverted fact that in 1997 neither Plaintiff Wilkins nor her supervisor requested a review or audit.  However, Plaintiff Wilkins did present evidence that sometime before Dr. Nelson left IHS in October 1997 Dr. Nelson recommended to Karen Ware, one of Mr. Caldwell's employees, that Plaintiff Wilkins receive an accretion of duties promotion.  (See Declaration of Dr. Nelson, Pls' Resp. Ex. 1 ¶ 16.)

---

[15] In fact, virtually all of the briefing on the accretion of duties claim concerned whether an desk audit or review took place, not whether Defendant denied Plaintiff Wilkins a promotion and when such denial occurred.  As to the narrow question of whether a position review or audit took place, Plaintiff Wilkins made the better argument.  Plaintiff Wilkins proposed offering testimony of Mr. Caldwell to further buttress her arguments made in the briefs.  The court denied that request since, even without the proposed evidence, Plaintiff Wilkins had shown that a desk audit or review took place.  However, as explained supra, her claim fails for other reasons.

In his declaration, Dr. Nelson did not indicate Ms. Ware's or anyone else's response to his recommendation. Plaintiff Wilkins also swore that before Dr. Nelson left in October 1997, Plaintiff Wilkins asked Karen Ware how to pursue a promotion and Ms. Ware responded that "IHS would do nothing because there was a freeze on promotions." (Pls' Resp. Ex. 3.)

The court was quite confused by the parties' briefing regarding the chronological sequence of Plaintiff Wilkins' protected conduct and Defendant's allegedly retaliatory response to it. It seemed clear from the briefs that Plaintiff Wilkins' protected conduct was the filing of a charge of discrimination with the EEO on October 3, 1997. However, the date of alleged retaliation--the date Defendant allegedly refused Defendant Wilkins a promotion or a pay raise--was imprecisely described as "on or about October 1, 1997." If Plaintiff Wilkins was claiming that prior to October 3, 1997 Defendant wrongfully refused to compensate her for taking on increased duties and work, such an action by the Defendant could not have been in retaliation for Plaintiff Wilkins later filing, on October 3, 1997, of a discrimination claim. On the other hand, if by "on or about October 1, 1997" Plaintiff Wilkins meant Defendant's alleged wrongful refusal to acknowledge Plaintiff Wilkins' performance of additional duties occurred after she filed the EEO charge on October 3, 1997, then the refusal conceivably could be considered retaliatory.

In an effort to have the parties address the court's confusion and clarify the sequence of events, on October 17, 2000, the court wrote a letter to counsel about this. The result was an exacerbation of the confusion. Plaintiff Wilkins' attorney replied to the court's October 17, 2000 letter by a letter dated April 13, 1999 in which counsel stated that "Plaintiffs may have inadvertently misled the court by giving the October 1, 1997 date as when the retaliatory event occurred." In the letter, obviously misdated April 13, 1999, counsel for Plaintiff Wilkins took the

32

position that Defendant's retaliatory conduct spanned three years "from September 1996 through August of 1999. . . ."

Plaintiff Wilkins' inability to specify 1) a date on which Defendant allegedly refused to compensate her and 2) the person responsible for such refusal are symptoms of fatal flaws in her claim. First, Ms. Ware's statement cannot reasonably be construed as a refusal to compensate or a refusal to initiate the promotion process. Even if they were, however, those acts occurred before October 1997 and thus pre-dated Ms. Wilkins' protected conduct. Still further, Plaintiff Wilkins now claims she was mistaken when she contended that her claim accrued on or about October 1, 1997. Therefore, to the extent Plaintiff claims Defendant retaliatorily denied to her a requested promotion before October 3, 1997 when she engaged in protected conduct, her claim fails for lack of jurisdiction.

As to Plaintiff Wilkins' claim that Defendant retaliated after October 3, 1997, the date of her protected conduct, her claim fails on its merits. Plaintiff Wilkins provides no evidence that she or anyone else on her behalf after October 3, 1997 requested a promotion which Dr. Vanderwagen, Ms. Ware, Mr. Caldwell or anyone else at IHS after October 3, 1997 refused. The first promotion inquiry after October 3, 1997 on which Plaintiff Wilkins places a date occurred in April 1999. Plaintiff Wilkins presents evidence that in April and July 1999 Plaintiff O'Neal asked Gary J. Hartz and perhaps another unknown person or persons at IHS to process a promotion for Plaintiff Wilkins. (See e-mail message from Plaintiff O'Neal to Gary J. Hartz dated July 8, 1999, Pls' Resp. Ex. 16.) As noted, a promotion was approved and effectively made retroactive to

33

March 1999.[16]  (See Pls' Resp. Ex. 17.)  Still further, and again according to Plaintiff's own evidence, it appears that a review or audit--a precursor to a promotion--was underway as early as 1998.  (See, e.g., Pls' Ex. 15.)  In short, Plaintiff points to no denied request following her protected conduct.

Plaintiff is not aided by claiming, as she does in her most recent letter to the court,[17] that "[o]bviously, this particular retaliatory event was of a continuing nature and could not have occurred on a single date."  I see no reason why it would be impossible or even difficult to pinpoint a date on which Plaintiff Wilkins says Defendant retaliatorily refused to give Plaintiff Wilkins a promotion.  To the extent Plaintiff Wilkins means that the continuing event was that she worked for a prolonged period at a wage that did not fairly compensate her for increased duties, Plaintiff Wilkins fails to explain why 1) Defendant would be liable for failing to promote her without ever refusing a requested promotion and 2) she should be entitled at this late date to make this apparently brand new claim, markedly different from that described in her More Definite Statement in which she claimed Defendant refused to promote her.  Summary judgment as to Plaintiff Wilkins' accretion of duties claim will therefore be granted.

---

[16] The other evidence Plaintiff Wilkins presents is similarly unhelpful to her.  Plaintiff Wilkins in her declaration does not allege she ever requested a promotion after Dr. Nelson left. Dr. Nelson's declaration is similar.  Plaintiff O'Neal in her declaration states that she approached Dr. Bingham at an unspecified time "to act on the audit that recommended the promotion for Ms. Wilkins."  (See Pls's Ex. 2.)  There is no indication that anyone denied this request, and, as noted Plaintiff Wilkins did receive a promotion.  Nothing in Mr. Caldwell's deposition suggests that after October 3, 1997 a request for promotion was made and/or denied.

[17] This is the letter from Plaintiff Wilkins' counsel that is inexplicably dated April 13, 1999.

9.      **Plaintiff Wilkins and the IHS Initiative on Domestic Violence and Child Abuse**

Plaintiff Wilkins in her More Definite Statement claims that Defendant retaliated against her on or about October 1, 1996 when no funding was allocated for the IHS Initiative on Domestic Violence and Child Abuse in spite of approval for funding. (See More Definite Statement at 11.) Plaintiff Wilkins' only act of protected conduct properly before the court took place on October 3, 1997. Therefore, Plaintiff Wilkins' claim that IHS retaliated against her by not funding the IHS Initiative on Domestic Violence and Child Abuse will be denied.

## II.      **Defendant's motion for partial summary judgment**

On November 20, 1996 the EEO issued to Plaintiff O'Neal a final agency decision on her complaint that Defendant engaged in sex-based discrimination and created a hostile work environment. The November 20, 1996 decision formed the basis of sex-based discrimination and hostile work environment claims in the Complaint. The gravamen of the Complaint is that Mr. Canizales harassed Plaintiffs with foul language and threats of violence.[18]

---

[18] First, this motion will be construed to address Counts I ("Sex-based Discrimination") and II ("Hostile Environment Discrmination") of the Complaint. There are no allegations of quid pro quo sexual discrimination or any similar charges that would support a separate finding of "sex-based discrimination," independent of a hostile work environment finding. Instead, as both parties frame their arguments, the hostile work-environment claim is for creation of a hostile work environment based on Plaintiffs' gender. For instance, Defendant moves to dismiss "all claims stemming from the November 20, 1996 final agency decision," the decision which forms the basis of the Complaint. (Def's Memo. at 14.) Plaintiffs generally respond accordingly, and the court will too.

Second, this motion will be construed as addressed at Plaintiff Stewart as well as at Plaintiff O'Neal. At the time the parties briefed this motion, Plaintiff Stewart was not a party to the Complaint and has only been reinstated in this Memorandum Opinion and Order. Thus, in the interest of judicial economy, Defendant's arguments will be considered as directed at Plaintiff O'Neal and Plaintiff Stewart, and Plaintiff O'Neal's arguments will similarly apply in support of Plaintiff Stewart.

35

Since the issuance of the November 20, 1996 final agency decision, all three Plaintiffs received an additional final agency decision concerning allegations that Defendant intentionally created a hostile work environment based on sex when Mr. Canizales was allowed to enter Plaintiffs' workplace on August 27, 1997 and October 2, 1997. These allegations formed the basis of the Supplemental Complaint. Defendant now moves for summary judgment as to Plaintiff O'Neal's "sex-based hostile work environment claims" raised in the Complaint and in the Supplemental Complaint.

### A.    Complaint

Defendant's argument is that IHS management acted immediately and appropriately as soon as it learned of Mr. Canizales' behavior, precluding liability for the creation of a sex-based hostile work environment. Plaintiffs do not directly address Defendant's legal argument. Instead, Plaintiffs argue that some of the profanity which Mr. Canizales is accused of using is of the type that fosters a hostile work environment and that the facts on which Defendant rests its defense are in dispute.

The Tenth Circuit has identified a handful of ways in which an employer can be liable for hostile work environment sexual harassment by a co-worker. See Ford v. West, 222 F.3d 767, 775-76 (10th Cir. 2000). The only one of these that appears applicable to this case rests on negligence principles.[19] Under this theory, the employer will be liable where it "knew, or should have known, about the violation and failed to respond in a reasonable manner." Id. at 776 (citing, inter alia, Adler, 144 F.3d at 673).

_____

[19] Defendant argues its motion as if this is the only possible basis for liability. Plaintiffs do nothing to dispel Defendant's reasonable approach.

1.      **Knowledge**

In this case, there are two sets of discrete yet overlapping acts that Plaintiffs maintain

created a sex-based hostile work environment.  First, Plaintiffs claim that on May 26, 1993 Mr.

Canizales expressed thoughts of violence towards Plaintiff O'Neal and others (including his male

supervisor).  "A plaintiff demonstrates actual employer knowledge where the plaintiff has reported

harassment to management-level employees."  Id.  Without question, management-level

employees had actual knowledge of Mr. Canizales' threats almost immediately.  Dr. Nelson,

learned of Mr. Canizales' threats the same day they occurred.  Dr. Nelson immediately reported

Mr. Canizales' behavior to Dr. Vanderwagen, Dr. Nelson's supervisor.[20]

Second, Plaintiffs claim that Mr. Cainzales' exercise of a wide vocabulary of gender-

specific and sexually-explicit profanity fostered a sex-based hostile work environment "soon after"

Mr. Canizales assumed his Albuquerque post in February 1992 and before his violent outburst in

late May 1993.  (Compl. ¶ 30.)  The first instance of Mr. Canizales' workplace use of foul

language in Albuquerque on which Plaintiffs place a specific date allegedly occurred in December

1992.  Plaintiffs claim that Mr. Canizales made a crude sexual comment then to Plaintiff Stewart

about Plaintiff O'Neal.  (See Compl. ¶ 43.)  Defendant states that Plaintiffs' sex-based hostile

work environment claim began with unspecified events in August 1992.  (See Def's Memo. at 1.)

Defendant contends that IHS management did not know of Mr. Canizales' alleged

_____

[20] This allegation concerning what Dr. Nelson knew about Mr. Canizales' actions and Dr. Nelson's response appears in Defendant's uncontested fact number one.  Plaintiffs dispute Defendant's fact one as follows: "Clearly as indicated by the lengthy hearing testimony and exhibits for the Preliminary Injunction this is a disputed fact."  (Pls' Resp. at 2.)  It is not duty of a court to sift through a record (particularly a large one) to make a party's case.  See Adler, 144 F.3d at 672.  Defendant's fact one is thus deemed admitted.

fondness for foul language until June 21, 1993 when Dr. LeMyra DeBruyn told Dr. Nelson of the

words Mr. Canizales had used.  Dr. Nelson claims to have promptly reported this to Dr.

Vanderwagen.  (<u>See</u> Aff. of Dr. Nelson at 12; Def's Memo. Ex. 1.)  Dr. Vanderwagen claims that

he first knew of Mr. Canizales' vocabulary in late May or early June 1993 when Dr. Nelson told

him about it.  (<u>See</u> Aff. of Dr. Vanderwagen at 1-2, Def's Memo. Ex. 2.)  Plaintiffs' primary

response is that IHS management was made aware of Mr. Canizales' use of workplace profanity

while he was posted in California, immediately before coming to New Mexico.[21]

To be sure, the use in the workplace of words (which need not be repeated here) of the

sort Plaintiffs attribute to Mr. Canizales can amount to discrimination.  <u>See, e.g.</u>, <u>Gross v.

Burggraf Constr. Co.</u>, 53 F.3d 1531, 1539 (10th Cir. 1995).  But the questions Defendant raises,

and which Plaintiffs must rebut, are (1) whether Defendant was aware of Mr. Canizales' use of

profanity directed at others and, if so, (2) whether that knowledge raises a genuine issue of

material fact as to whether Defendant knew or should have known of Mr. Canizales' conduct with

respect to Plaintiffs.  <u>See</u> <u>Adler</u>, 144 F.3d at 673; <u>Hirase-Doi v. US West Communications, Inc.</u>,

61 F.3d 777, 784 (10th Cir. 1995).

In support of their claim that IHS management knew of Mr. Canizales' affinity for

profanity while he worked in California, Plaintiffs submit two affidavits.  Other than to claim that

the events described therein are nearly identical to those of which Plaintiffs complain, Plaintiffs

make no real argument as to how the affidavits help them overcome their summary judgment

---

[21] Plaintiffs also respond that Dr. Nelson is an IHS manager.  Defendant agrees with this
statement but notes, correctly, that Plaintiffs have failed to point to any evidence which would
demonstrate that Dr. Nelson or any other New Mexico IHS manager was informed before May or
June 1993 that Mr. Canizales was creating a hostile work environment for Plaintiffs through
coarse, gender-specific language.

burden. One affidavit is from Margaret Eisenbise, a subordinate to Mr. Canizales in California. In it, she states explicitly that she did not report to anyone Mr. Canizales' use of what she perceived to be hostile and sexually offensive language. (See Aff. of Ms. Eisenibse at 5, Pls' Resp. Ex. 8.) The other affidavit is from Dr. Wynne DuBray, a supervisor of Mr. Canizales and Ms. Eisenbise in California. In it, Dr. DuBray relates obscene statements made about her to members of her staff by Mr. Canizales. (See Aff. of Dr. DuBray at 3, Pls' Resp. Ex. 7.) As Defendant points out, "[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill." Gross, 53 F.3d at 1540 (citing Thomas v. IBM, 48 F.3d 478, 485 (10th Cir. 1985)). However, Dr. DuBray also states that she herself heard Mr. Canizales' make some offensive remarks of a sexual nature.

As to these words which a management-level employee heard herself, the issue is whether, as Defendant maintains, the knowledge of an IHS supervisor in California is sufficient to rebut the New Mexico Plaintiffs' claims. Because the incidents in California are "too remote," as Defendant contends, from those concerning Plaintiffs, they do not serve to raise a genuine issue of fact. (Def's Reply at 2.) Although Ms. DuBray does not place a precise date on the derogatory comments she heard in California, they must have predated Mr. Canizales' February 1992 move to Albuquerque. The earliest substantiated dates showing that anyone in IHS management anywhere knew of gender-specific profanity directed at the New Mexico Plaintiffs are, as noted previously, late May and/or June 1993. In Hirase-Doi, 61 F.3d at 784, evidence that other employees had complained to management of nearly identical conduct from the same harrasser, in the same work location and in the same time period as Plaintiff was harassed, created an issue of fact as to the corporate defendant's knowledge. In contrast, the supported instances of

harassment in this case are simply too far removed, temporally and geographically, from one another to form a factual dispute as to whether IHS knew or should have known of Mr. Canizales' use of vulgar language with respect to Plaintiffs.

Before proceeding, it is important to note that Plaintiffs do not make any argument grounded in caselaw concerning Defendant's actual or constructive knowledge, in spite of Defendant's heavy reliance on <u>Adler</u> (which contains an extensive discussion of employer knowledge) and application of <u>Adler</u> to the facts of this case. A court's role, as the Tenth Circuit has repeatedly stated, is not to make a party's case for it. <u>See, e.g.</u>, <u>Adler</u>, 144 F.3d at 672. All parties have had an extraordinary amount of time before the present motions were filed to research and analyze this case and have had multiple opportunities to present their positions to various administrative bodies and this court. For a court to fashion an argument for a non-movant, especially in light of these ample opportunities, would not only be improper but also unfair.

### 2.   Employer response

Having established that those in IHS management in a position to act learned of Mr. Canizales' violent behavior almost immediately and of his explicit and gender-specific comments in late May or June 1993, Defendant contends that the IHS response was appropriately swift and harsh. The Tenth Circuit in <u>Adler</u> stated that an appropriate response--and one that forms a defense to Title VII employer liability--is one "reasonably calculated to end the harassment." 144 F.3d at 676 (citations omitted). Plaintiffs again do not make a responsive legal argument but instead attempt to rely on allegedly disputed facts.

The undisputed facts are that Mr. Canizales after May 26, 1993 never worked again with

Plaintiffs in the Mental Health/Social Services program in Headquarters West.  While there is some dispute as to why Mr. Canizales, at least initially, never returned to work there, none of it is material.  Whether Mr. Canizales was placed on administrative leave (as Defendant claims) or stress leave (as IHS Personnel Management Specialist, Karen Thomas describes), or medical leave and/or because he was the victim of harassment (as Mr. Canizales claims), during his absence his supervisors moved to assure that incidents of which Plaintiffs complained did not recur.

It is unclear precisely how long Mr. Canizales' leave period existed.  Karen Thomas, describes it as "prolonged."  (Aff. of Karen Thomas at 2, Def's Memo. Ex. 3.))  However, it is clear and undisputed that IHS management worked hard to keep Mr. Canizales away from Plaintiffs and determined to find him a new placement when he returned to work.  Some managers, including Dr. Nelson, advocated termination.  That suggestion was obviously rejected, in part out of justified concerns that Mr. Canizales would file his own discrimination claim. Instead it appears that Mr. Canizales did return to work in July 1993 to a new job assignment in a different division in another building.

Contrary to Plaintiffs' contention in their response, they do not present any evidence to contradict the accuracy, or success, of management's efforts to immediately restore to Plaintiffs a non-hostile work environment him following Mr. Canizales' outburst of threatened violence. Specifically, Mr. Canizales does not indicate otherwise in his testimony to which Plaintiffs cite. Neither does any statement in Plaintiffs' Exhibits One, Two or Three.  (See Pls' Resp. at 3.)   The closest Plaintiffs come to presenting a dispute of material fact is a statement by Wilbur Woodis, one of Mr. Canizales' co-workers and not an IHS manager.  Mr. Woodis testified that after Mr. Canizales had been detailed away from Plaintiffs and into Mr. Woodis' branch, he "spoke angrily

41

about the women in MH/SSPB, including Ms. O'Neal."  (Aff. of Wilbur Woodis at 2, Pls' Resp.

Ex. 5.)  But Plaintiff O'Neal was not present.  Without more information it is impossible to find

that an unspecified angry statement to a third party, which Plaintiff O'Neal did not personally

hear, creates a hostile work environment.  The other evidence Plaintiffs point to fails to create a

material factual dispute for similar reasons.  (See Aff. of Laura Maheux West at 1, Pls' Resp. Ex.

14  (not indicating "rude and hostile" comments directed at anyone other than affiant);  Aff. of

Flanders Byford at 2, Def's Resp. Ex. 15 (relating Mr. Canizales' recitation of foul language he

was accused of using); Testimony of Marlene Echohawk at 34-35, Def's Resp. Ex. 11 (not

indicating time).)  Defendant's response was thus reasonably calculated to end any harassment

towards Plaintiffs and in fact achieved that goal.

### B.    Supplemental Complaint

Plaintiffs in their Supplemental Complaint contend that Mr. Canizales' appearances in

Headquarters West on August 27, 1997 and October 2, 1997 created a hostile work environment.

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work

environment--an environment that a reasonable person would find hostile or abusive--is beyond

Title VII's purview."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993).  The Third Circuit in

Konstantopoulos v. Westvaco Corp., 112 F.3d 710 (3rd Cir. 1997) considered a sexual

harassment claim similar to those in the Supplement Complaint.  In that case, the female plaintiff's

male co-workers directed derogatory and sometimes profane sexual comments and gestures at

her.  See Konstantopoulos 112 F.3d at 712-13.  After making management aware of at least some

of these incidents, the plaintiff took a leave of absence for several months.  See id. at 712-13.

Upon return, management placed her in a work "tour" or shift in close physical proximity to those

who harassed her earlier.  See id. at 713.

The Third Circuit found that to the extent she argued her placement upon return amounted to sexual harassment "per se" her claim was not persuasive.  Relying, inter alia, on Harris, 510 U.S. at 23, the Third Circuit found that "the proper test is whether, under all the circumstances, a reasonable person would find the working environment to be hostile or abusive."  Id. at 717. Applying that rule, the Third Circuit found no Title VII violation from her placement upon return. Id. at 718.

Similarly in this case the totality of the circumstances surrounding Mr. Canizales' entries into Headquarters West on August 27, 1997 and October 2, 1997 do not give rise to a hostile or abusive work environment claim.  This case's overall circumstances are decidedly less threatening than even those of Konstantopoulos, in which the court found no sexual harassment.  Here, it is undisputed that Mr. Canizales would occasionally be permitted to enter the building in which Plaintiffs worked for a very limited purpose and with authorization to stay only on the first floor, two floors away from Plaintiffs.  (See section I.B.1 supra.)  Plaintiffs were given advance notice of these instances and were also given the chance to take administrative leave, which they took. (See id.)  There is also absolutely no evidence that Mr. Canizales swore at Plaintiffs or threatened them on August 27, 1997 and October 2, 1997 or that they even crossed paths.  As was noted with respect to the retaliation claims stemming from the same facts, Defendant attempted to balance the interests of the parties in such a way as to not discriminate against anyone while peaceably resolving the dilemma Mr. Canizales thrust upon IHS.  "The propriety of [IHS'] conduct, [its] good faith, and [its] freedom from any intent to discriminate are manifest."  See Blankenship, 123 F.3d at 874.

IT IS THEREFORE ORDERED THAT

(1) Defendant's motion for summary judgment as to Plaintiffs O'Neal's and Stewart's retaliation claims stemming from Mr. Canizales' entry into their workplace on March 7, 1994 is denied;

(2) Defendant's motion for summary judgment as to all other of Plaintiffs O'Neal's, Wilkins' and Stewart's retaliation claims stemming from Mr. Canizales' other entries into their workplace is granted;

(3) Defendant's motion for summary judgment as to Plaintiff O'Neal's claim concerning the cancellation of a training opportunity is denied;

(4) Defendant's motion for summary judgment as to Plaintiff O'Neal's claim concerning Dr. Bingham's appointment is denied;

(5) Defendant's motion for summary judgment as to Plaintiff O'Neal's claim concerning the restructuring of the Mental Health Chief position is granted;

(6) Defendant's motion for summary judgment as to Plaintiffs O'Neal's and Stewart's claims concerning Dr. Nelson's reassignment is granted;

(7) Defendant's motion for summary judgment as to Plaintiffs O'Neal's and Stewart's claims concerning reassignment out of state is denied;

(8) Defendant's motion for summary judgment as to Plaintiffs O'Neal's and Stewart's claims concerning correspondence to Dr. Nelson is granted;

(9) Defendant's motion for summary judgment as to Plaintiff O'Neal's claim concerning her exclusion from the Eldercare Focus Group is granted;

(10) Defendant's motion for summary judgment as to Plaintiff Wilkins' accretion of duties

claim is granted;

(11) Defendant's motion for summary judgment as to Plaintiff Wilkins' claim concerning the IHS Initiative on Domestic Violence and Child Abuse is granted;

(12) Defendant's motion for summary judgment as to all sex-based hostile work environment claims is granted; and

(13) Defendant's requests for costs incurred in presenting her motions are denied.

_____
**CHIEF UNITED STATES DISTRICT JUDGE**

45